COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| TRANSMOUNTAIN PARTNERS, LLC and JOSE A. GONZALEZ, | § | No. 08-22-00162-CV |
| Appellants, | § | Appeal from the |
| v. | § | 346th Judicial District Court |
| ERNEST A. ROMERO, JOHN J. GRAB, WHITE'S EL REY, L.P., a New Mexico Limited Partnership, GGD, LLC, a New Mexico Limited Liability Company, as Assignee of the George Gary Duncan Profit Sharing Plan and GEORGE GARY DUNCAN, | § | of El Paso County, Texas |
| | § | (TC# 2018-DCV-1739) |
| Appellees. | § | |

**MEMORANDUM OPINION**

This case regards a commercial real estate deal gone sour. In November 2015, Appellant Jose A. Gonzalez (Gonzalez), by and through an entity he managed at the time, entered into a contract to purchase a 115-acre parcel of property from Appellees for approximately $20 million. At Gonzalez's request, the sales contract was amended several times to extend the closing date, and in 2017, Appellees allowed Gonzalez, by and through his newly created entity, Appellant Transmountain Partners, LLC (TPL), to purchase a 25.5-acre portion of the property and make installment payments on the purchase. After TPL failed to make its first installment payment,

Appellees sued TPL, claiming, among other things, that TPL had breached the parties' contract. After intervening in the lawsuit, Gonzalez and TPL filed counterclaims against Appellees, claiming Appellees were the first to materially breach the contract by failing to convey clear title to the 25.5-acre parcel, and Appellants were therefore entitled to either damages for the breach or specific performance of the contract. Appellees responded, raising several affirmative defenses, and thereafter filing: (1) a "dispositive" motion for summary judgment in which they argued they had undisputed evidence to establish their affirmative defenses as a matter of law; and (2) a combined no-evidence and traditional motion for summary judgment in which they argued Appellants had no evidence to support any of their counterclaims. The trial court granted both motions, and after Appellees nonsuited their claims against Appellants, the trial court's judgment became final. Because we conclude that Appellants failed to present sufficient evidence to support the elements of their breach-of-contract counterclaim and request for specific performance, we affirm the trial court's judgment.

## FACTUAL BACKGROUND

### A. The 2015 sales contract

The 115-acre parcel at issue is located in El Paso on the corner of I-10 and Transmountain Road (the Property). On November 2, 2015, Gonzalez, a commercial real estate broker from Houston, sent an email to one of the Property's owners, Appellee Ernest A. Romero (Romero), seeking to purchase the Property. Gonzalez attached a proposed sales contract enumerating most of the key terms, including the names of the sellers, which was executed after three weeks of negotiations, with an effective date of November 24, 2015 (the 2015 Contract). Gonzalez agreed to purchase the Property for approximately $20 million through the El Paso Opportunity Fund,

2

LLC. (EP Opportunity), an entity he managed. The 2015 Contract gave EP Opportunity 120 days to conduct feasibility studies and provided for closing 30 days thereafter.

### B. The ownership interests in the Property

At the time the 2015 Contract was signed on November 4, 2015, Romero and Appellee John J. Grab (Grab) each owned a 3.5% interest in the Property, while a New Mexico Limited Partnership they formed, Phase One Equities, Inc. (Phase One), owned a 43% interest. Appellee George Gary Duncan, by and through his retirement plan, the George Gary Duncan Profit Sharing Plan[1] (Duncan) and Appellee White's El Rey, LP, a New Mexico limited partnership owned by Terrell White, (White's El Rey) each owned a 25% interest in the Property as co-tenants.

Relevant to this appeal, on November 18, 2005, Romero, as Phase One's president, executed two documents, both entitled, "Memorandum of Real Estate Contracts," in which Phase One stated it agreed to sell and convey its 43% interest in the Property to Romero and Grab in equal shares, with each to own a 21.5% interest in the Property upon completion of the terms of their sales agreements (the Phase One Memoranda). On the same day, as part of this transaction, Romero—again signing as Phase One's president—executed two warranty deeds, stating that Phase One was conveying its interests in the Property to Romero and Grab respectively, in consideration of a $10 payment (the Phase One Deeds). Both deeds stated they were to be "effective as of the date of recording." The Phase One Memoranda were recorded in the El Paso County real property records in November of 2006, and at the same time, Romero deposited the unrecorded deeds with an escrow agent in New Mexico pending completion of the sales

---

[1] The George Duncan Retirement Plan's interest was later assigned to Appellee GGD, LLC, a New Mexico Limited Liability Company. We also refer to that entity as "Duncan."

agreement.[2] However, when the 2015 Contract was executed, Romero and Grab had admittedly not yet consummated their Phase One sales contracts and had not yet recorded the Phase One Deeds.

The 2015 Contract listed as sellers Duncan, Romero, Grab, and White's El Rey (collectively, the Sellers). However, next to the Sellers' names was a notation stating: "(See Exhibit A)." Exhibit A was a schedule identifying each of the Sellers and their respective ownership interests, providing that each had a 25% interest in the Property and further stating: "Joined by Phase One Equities, Inc. a New Mexico corporation." Sierra Title subsequently issued a title commitment effective November 18, 2015 (the 2015 Title Commitment), which provided that record title in the Property was held as follows: White's El Rey (25%), Phase One (43%), Duncan (25%), Romero (3.5%), and Grab (3.5%). And Schedule C to the 2015 Title Commitment stated that the title insurance company required "consummation" of the real estate contracts in which Phase One had agreed to convey its 43% interest in the Property to Romero and Grab, as "evidenced by Memorandum of Real Estate Contract dated November 18, 2005, filed for record on November 21, 2006, in the Office of the County Clerk of El Paso County, Texas . . . [.]"

As explained in more detail below, Romero and Grab admittedly waited until November 2016 to fulfill their obligations under their sales agreements to purchase Phase One's interest in the Property. In addition, Romero and Grab admittedly failed to inform their designated escrow agent that those conditions had been met and failed to record the Phase One Deeds until almost two years later (in August 2018).

---

[2] As discussed below, the memoranda also reflected that the parties signed reconveyance deeds, which were also deposited in escrow, giving Phase One the right to record those deeds if Romero and Grab defaulted on their contractual obligations under the sales agreements.

## C. The Parcel I sales agreement and warranty deeds

Although the 2015 Contract originally gave EP Opportunity 120 days to complete feasibility studies, Gonzalez informed the Sellers he needed more time. At Gonzalez's request and in exchange for nonrefundable payments, the parties amended the 2015 Contract several times to extend the closing date. In early 2017, when EP Opportunity had still not tendered payment of the sales price, Gonzalez proposed restructuring the 2015 Contract to allow his newly formed entity, Appellant Transmountain Partners, LLC (TPL), to purchase the Property in three phases, while obtaining immediate title to a 25.5-acre portion of the Property, referred to as "Parcel I." Gonzalez represented to the Sellers that giving TPL immediate title to Parcel I would allow him to procure financing for the remaining parcels. The Sellers agreed to execute a warranty deed transferring ownership of Parcel I to TPL in exchange for a note to the Sellers wherein TPL agreed to pay $5.5 million by April 20, 2017 (the Parcel I Note).[3] And on March 17, 2017, the parties executed their fourth amendment to the 2015 Contract, reflecting those terms (the Parcel I Sales Agreement). The Parcel I Sales Agreement contained a deed-back provision entitled, "Escrow and Default," providing that title would revert back to the Sellers if TPL failed to close on or before April 20, 2017, and requiring TPL to execute a reconveyance deed to that effect. The Parcel I Sales Agreement only listed Romero, Grab, Duncan, and White's El Rey as the Sellers; it did not refer to Phase One as having any interest in the parcel.

Gonzalez's lawyer drafted, and the parties executed, two mirror-image deeds in accordance with the Parcel I Sales Agreement. The first deed listed Romero, Grab, Duncan, and White's El Rey as the Grantors, and TPL as the Grantee (the Parcel I Conveyance Deed) and was recorded on March 21, 2017. The second deed listed TPL as the Grantor and the Appellee Sellers as the

---

[3] The Fourth Amendment further stated Transmountain could purchase Parcel II for $11,107,800 and Parcel III for $3,885, 987.60, and that both purchases were to close and fund in April 2018.

5

Grantees (the Parcel I Reconveyance Deed). The Parcel I Reconveyance Deed was sent to Sierra Title to be placed in escrow. Neither deed named Phase One as a Grantor or Grantee.

### D. The parties' final agreement

After TPL failed to pay the $5.5 million owed on the Parcel I Note by the April 2017 deadline, the parties amended the Parcel I Sales Agreement several times to give TPL additional time to pay it. When payment was still not forthcoming almost a year later, the parties entered into one last agreement, with an effective date of February 28, 2018, memorializing all of the parties' prior agreements and TPL's failure to fulfill its contractual obligations under the Parcel I Sales Agreement, but stating the Sellers' wish to "revive" their agreement to sell TPL the Property under newly specified terms (the Final Agreement). Once again, the Sellers listed were Romero, Grab, Duncan, and White's El Rey, and the Purchaser listed was TPL. The Final Agreement made no mention of Phase One.

The Final Agreement recited that TPL had made a non-refundable earnest money payment to be applied to the total Parcel I purchase price and that TPL currently owed $4,746,350.80 on the Parcel I Note. The Final Agreement then gave TPL the right to make three installment payments. TPL's first installment payment of $1 million was due on April 14, 2018, and its second and third payments were due on July 12, 2018, and July 27, 2018, respectively. It further required TPL to reimburse the Sellers for the property taxes they had been paying on the Property while the sale was pending. Importantly, the Final Agreement stated that unless TPL made the first installment payment by the specified April deadline, the parties' agreement would terminate and the escrow agent at Sierra Title, David Puente, who held the Parcel I Reconveyance Deed, was directed to record that deed:

> 3.a. On or before April 14, 2018, Purchaser shall pay to Sellers $1,000,000 plus $194,597.91 as reimbursement for real estate taxes Sellers have paid for 2015 (pro-rated since contract inception - $17,676.29) and 2016 ($176,921.62).

6

.    .    .

> If Borrower/Buyer does not make the payment, required by 3.a. above, to the escrow agent by wire transfer, not by check. no later than 12:00 p.m. on April 14, 2018, or as such earlier time as may be required by the escrow agent to enable it to wire transfer the funds to Lender/Seller the same day, this Agreement shall be over; kaput. Upon Lender/Sellers notification by email to the escrow agent that Borrower/Buyer failed to make the payment as specified, escrow agent shall forthwith record the Warranty Deed from Borrower/Buyer back to Lender/Sellers, which he presently has in his possession.

TPL admittedly did not make the required payment to the Sellers prior to the April 14, 2018 deadline, and the Sellers thereafter instructed Puente to record the Parcel I Reconveyance Deed; however, Puente failed to do so, claiming he had been given conflicting directions from TPL not to record it.

### E.   TPL's dealings with Casaporta

Despite TPL's admitted failure to make the first installment payment on the Parcel I Note by the April deadline, TPL and Gonzalez were in ongoing negotiations with a third party, Casaporta Equity, Inc. (Casaporta), between April and August 2018, to purchase the Property. In July 2018, Casaporta requested an updated title report on TPL's interest in Parcel I, which Sierra Title issued with an effective date of July 18, 2018, stating "Record title to the land on the Effective Date appears to be vested in: Phase One Equities, Inc., as to an undivided 43% interest AND Transmountain Partners, LLC, a Texas limited liability company, as their interest may appear (emphasis in original)" (the 2018 Title Commitment).

Upon receiving the 2018 Title Commitment, Gonzalez sent Duncan a text message dated August 7, 2018, accusing the Sellers of wrongdoing in failing to ensure Phase One had conveyed its interest in the Property to Romero and Grab as promised. He further accused the Sellers of violating their obligation to convey clear title to TPL in the Parcel I Deed. Gonzalez informed Duncan that TPL had the necessary funds to close the sale of the Property ($20,500,000 less

7

Gonzalez's commission) and that they could "close this deal" in ten days. Duncan, however, refused his entreaties and immediately contacted Romero about the title issue. Romero then recorded the two Phase One deeds on August 10, 2018.

Apparently unaware that the Phase One deeds had been recorded, Casaporta signed a purchase agreement dated August 14, 2018, purporting to purchase the Property for $20,500,000, with a 120-day closing date, listing TPL, "Phase [One] Equities, Inc.," Grab, and Romero, as the Sellers. Thereafter, on August 18, 2018, Richard Schindler, Casaporta's principal, contacted the Sellers' attorney and informed him of the proposed purchase agreement, seeking his approval. Duncan, however, informed Schindler that TPL had no interest in the Property, given its default on the Parcel I Note, and that TPL was wrongfully claiming it still held the deed to Parcel I and an interest in the Property. Schindler then sent Duncan an email informing him that Casaporta was terminating its contract with TPL and would no longer engage in any dealings with TPL or Gonzalez (hereinafter, we refer to TPL and Gonzalez collectively as the TPL Parties).[4]

## PROCEDURAL BACKGROUND

### A. The Sellers' lawsuit

In the meantime, in May 2018, the Sellers filed a lawsuit against TPL, claiming TPL breached the Parcel I Sales Agreement by failing to pay the agreed-upon purchase price and by wrongfully directing Sierra Title and Puente not to record the Parcel I Reconveyance Deed.[5] In addition, the Sellers sued Sierra Title and Puente (the Sierra Title Defendants) for breach of

---

[4] Although the TPL Parties repeatedly allege Casaporta terminated the contract due to the "title issues" in the 2018 Title Commitment, they failed to obtain affidavits from or depose Schindler or any other Casaporta representative to support this belief.

[5] In their brief, the TPL Parties argue the Sellers prematurely filed the lawsuit in May 2018, contending the TPL Parties' final payment on the Parcel I Note was not due until July 27, 2018 (insinuating that the Parcel I Sales Agreement was still in force at that time). As set forth above, however, the parties' Final Agreement stated the parties' entire agreement would be terminated if the first payment was not made by the April 14, 2018 deadline, which in fact did not occur.

8

contract for refusing to record the Parcel I Reconveyance Deed and further sought a declaratory judgment setting forth their right to have the deed recorded, as well as injunctive relief to that effect.[6] Both sets of defendants filed general denials to the lawsuit.

### B. The Sellers' motion for partial summary judgment

On August 23, 2018, the Sellers filed a traditional motion for partial summary judgment, alleging the undisputed facts supported a finding that both sets of defendants breached the contracts, and the Sellers were entitled to the declaratory and injunctive relief requiring the Sierra Title Defendants to record the Parcel I Reconveyance Deed. The Sierra Title Defendants responded to the motion, claiming they had received conflicting instructions from the parties and were "innocent" of any wrongdoing, but they were willing to follow any instructions from the court. TPL, however, failed to file a response to the motion.

On October 25, 2018, the trial court granted the motion and directed the Sierra Title Defendants to turn over the Parcel I Reconveyance Deed to the Sellers for recording. They immediately complied with the order, and the Sellers recorded the Parcel I Reconveyance Deed. The Sellers later settled their claims against the Sierra Title Defendants, and at the Sellers' request, the trial court dismissed their claims against those defendants.

However, on November 19, 2018, alleging it did not receive proper notice of the summary judgment motion, TPL filed a motion for new trial and/or to vacate the order granting the Sellers' motion for summary judgment with respect to its interests in the lawsuit, explaining its lawyers had withdrawn from the case without advising TPL of the pending summary judgment motion. The trial court granted TPL's motion on January 31, 2019.

---

[6] In their amended petitions, the Sellers added additional claims against the defendants, including a claim for breach of fiduciary duty against the Sierra Title Defendants and claims for fraud and conspiracy against all of the defendants as well as claims under the Deceptive Trade Practices Act and the Texas Real Estate Licensing Act.

### C. The TPL parties' counterclaims against the Sellers

After retaining new counsel, TPL filed counterclaims against the Sellers, and Gonzalez further intervened in the case as TPL's manager, claiming TPL had a justiciable interest in the lawsuit.[7] The TPL Parties' counterclaims included breach of contract, alleging the Sellers failed to convey clear title to TPL at the time of the 2017 closing as they were contractually obligated to do, pointing to the 2018 Title Commitment listing Phase One as having a 43% interest in the Property.[8] And they asserted the Sellers' failure to convey clear title to TPL was the reason Casaporta's purchase of the Property fell through. The TPL Parties sought from the Sellers over $50 million in damages, to include the profits they contend they would have received if the Casaporta sale had been consummated, as well as their earnest money and costs incurred in conducting feasibility studies and in commercially developing the Property.[9] The TPL Parties also sought specific performance in lieu of damages and a declaratory judgment that they were the true owners of the Property.

In response to the counterclaims, the Sellers raised several affirmative defenses, including a waiver defense, asserting Gonzalez knew about Phase One's interest in the Property from the start of his contractual relationship with the Sellers, as reflected in the 2015 Title Commitment. And they pointed out that the TPL Parties accepted the Parcel I Conveyance Deed in 2017, which

---

[7] The TPL Parties also filed a crossclaim against the Sierra Title Defendants, which they later dismissed.

[8] The TPL Parties also brought counterclaims for breach of fiduciary duty, breach of warranty of title, common law and statutory fraud, fraud in the inducement, civil conspiracy, quiet title, and unjust enrichment, and further sought both declaratory and injunctive relief against the Sellers. However, as explained below, none of those counterclaims are at issue in this appeal.

[9] According to the TPL Parties, if the sale to Casaporta had been consummated, TPL would have received a $2 million bonus and Gonzalez would have received a $600,000 sales commission as well as $1,550,000 in commissions for ground leases Gonzalez had secured. Gonzalez also claimed he had entered into a "participation agreement" with Casaporta that would have netted him additional funds if the Property had been sold to a third party in the future.

did not list Phase One as a seller, without objection or requesting a cure, despite knowing of Phase One's potential interest in the Property.

### D. The Sellers' summary judgment motions on TPL's counterclaims

The Sellers thereafter filed two separate summary judgment motions seeking dismissal of the TPL Parties' counterclaims on two separate theories. First, the Sellers filed what they labeled a "dispositive" motion for summary judgment, contending the undisputed evidence established their affirmative defense of waiver and estoppel, which they argued was a "form of waiver." They argued the TPL parties had waived their right to raise the alleged title issue and/or were estopped from doing so based on their failure to seek a cure or object to the title issue until after the parties' agreement had already terminated. Second, the Sellers filed a combined no-evidence and traditional summary judgment motion, arguing the TPL Parties had no evidence to support the elements of any of their counterclaims. Relevant to this appeal, and as discussed in more detail below, the Sellers argued the TPL Parties could not support their claim for breach, as the undisputed evidence established: (1) the Sellers were not in breach of the Parcel I Sales Contract, as Romero and Grab had obtained both equitable and legal title to Phase One's interest in the Property prior to conveying the parcel to TPL in 2017; (2) TPL had failed to fulfill its obligations to the Sellers, as it failed to timely make the first installment payment required by the parties' contracts; and (3) the TPL Parties could not establish damages from the Sellers' alleged breach in failing to convey clear title.[10]

---

[10] We note that on November 5, 2018, while the litigation was ongoing, TPL recorded a lis pendens on the Property, seeking to establish its title. On the Sellers' motion, the trial court later expunged the lis pendens, finding "Defendants' Amended Counterclaim, upon which the lis pendens is based, does not contain a legitimate real property claim," and "even if the Amended Counterclaim stated an arguable real property claim, the Defendants failed to establish by a preponderance of the evidence the probable validity of the real property claim[.]" TPL thereafter filed a petition for writ of mandamus with this Court, which we denied, finding TPL had not demonstrated it was entitled to mandamus relief. *In re Transmountain Partners, L.L.C.*, No. 08-19-00316-CV, 2020 WL 401834, at *1 (Tex. App.—El Paso Jan. 24, 2020, no pet.) (mem. op.). On appeal, the Sellers assert the litigation should have been over at that point, and the expungement is yet another reason why the trial court properly dismissed the TPL Parties' counterclaims. The

The TPL Parties responded that although TPL admittedly did not perform its obligations under the Parcel I Sales Agreement, it was excused from doing so because the Sellers committed the first material breach of the parties' agreement when they failed to convey clear title to Parcel I at the time of the 2017 closing, making the tender of TPL's performance unnecessary. And again the TPL Parties argued that the Sellers' failure to convey clear title caused Casaporta to terminate its purchase agreement with TPL, which caused millions of dollars in damages.

### E.    The trial court's rulings

On November 9, 2020, the trial court issued two separate orders granting both of the Sellers' summary judgment motions, thereby dismissing all of the TPL Parties' counterclaims. The trial court denied the TPL Parties' motions for new trial and for rehearing, and after the Sellers nonsuited their claims against the TPL Parties, the trial court's judgment became final. This appeal followed.

ISSUES ON APPEAL

In two broad issues, the TPL Parties argue the trial court erred in granting the Sellers' summary judgment motions. Because we find that the trial court properly granted the Sellers' combined no-evidence and traditional summary judgment motion challenging the elements of the TPL Parties' counterclaims, we focus only on the parties' arguments with respect to that motion. As explained below, the TPL Parties contend the record contains more than a scintilla of evidence to raise a question of fact regarding whether they could satisfy the elements of their counterclaim for breach of contract and their request for specific performance. Again, they argue the Sellers

---

Sellers, however, did not raise the trial court's expungement order as a ground for granting summary judgment in either of their summary judgment motions, and we therefore do not consider it as a basis for affirming the trial court's summary judgment orders on appeal. *See Rise Above Steel Co., LLC. v. Liberty Mut. Ins. Co.*, 656 S.W.3d 577, 581 (Tex. App.—El Paso 2022, no pet.) (recognizing that an appellate court "cannot affirm a summary judgment on a ground not expressly presented in the motion for summary judgment").

committed the first material breach by failing to convey clear title in the 2017 Parcel I deeds, thereby excusing TPL's performance and causing significant damage. In their jointly filed Appellees' brief, the Sellers maintain that the trial court properly granted their motion—the Sellers assert they conveyed clear title to TPL, they were never in breach of contract, and their conduct did not cause any damages. And in a separately filed brief, Appellee Duncan seeks damages against the TPL Parties pursuant to Texas Rule of Appellate Procedure 45 for filing a frivolous appeal.

Although we affirm the trial court's order granting the Sellers' combined no-evidence and traditional summary judgment motion, we decline Appellee Duncan's Rule 45-damages request.

## STANDARD OF REVIEW

We review the grant of a motion for summary judgment de novo. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013); *Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*, 663 S.W.3d 569, 576 (Tex. 2023). If a party moves for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). In a no-evidence summary judgment case, the party without the burden of proof may, after an adequate time for discovery and without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the non-movant's claim or defense on which the adverse party would have the burden of proof at trial. *See Draughon v. Johnson*, 631 S.W.3d 81, 88 (Tex. 2021) (citing TEX. R. CIV. P. 166a(i)); *see also Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (recognizing that to "prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's claim"). When a movant meets its burden of establishing each element of the claim or defense on which it seeks summary judgment, the burden then shifts to the non-movant to disprove or raise an issue of fact as to at least one of those

challenged elements. *See Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014) (citing *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979)). Although the "nonmoving party is not required to marshal all its proof in response to a summary judgment motion [it] must present evidence that raises a genuine issue of material fact on each of the challenged elements." *Herrera v. Resignato*, 621 S.W.3d 835, 840–41 (Tex. App.— El Paso 2021, no pet.) (citing *Stierwalt v. FFE Transp. Services, Inc.*, 499 S.W.3d 181, 194 (Tex. App.—El Paso 2016, no pet.)). A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. *Ridgway*, 135 S.W.3d at 600 (citing *Morgan v. Anthony*, 27 S.W.3d 928, 929 (Tex. 2000) (per curiam)). This requires the non-movant to produce evidence regarding each challenged element that "would enable reasonable and fair-minded people to differ in their conclusions." *Id.* at 601 (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). If the non-movant "brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, a no-evidence summary judgment cannot properly be granted." *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009).

"A party moving for traditional summary judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and that it is entitled to judgment as a matter of law." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017) (citing TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017)). When a movant meets the burden of establishing each element of the claim on which it seeks summary judgment, the non-movant bears the burden of disproving or raising a fact issue as to at least one of those elements. *Urias v. Owl Springs N., LLC*, 662 S.W.3d 561, 566 (Tex. App.—El Paso 2022, no pet.) (citing *Amedisys*, 437 S.W.3d at 511). But if the movant does not meet its initial burden, the burden does not shift, and

the non-movant need not respond or present any evidence. *Id*. "This is because 'summary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right' to judgment." *Amedisys,* 437 S.W.3d at 511–12 (quoting *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 (Tex. 1993)).

When reviewing both a no-evidence and traditional motion for summary judgment, we review the evidence in the light most favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts against the motion. *Lyle v. Midway Solar, LLC*, 618 S.W.3d 857, 868 (Tex. App.—El Paso 2020, pet. denied) (citing *Ridgway*, 135 S.W.3d at 600; *Lightning Oil Co.*, 520 S.W.3d at 45).

## BRIEFING WAIVER

As a preliminary matter, the Sellers argue we should not consider any of the TPL Parties' issues or arguments on appeal based on briefing waiver, asserting that the TPL Parties' brief violates the Rules of Appellate Procedure because it lacks "a clear and concise argument for the contentions made [and lacks] appropriate citations to authorities and to the record." They posit that the TPL Parties' brief does "not clearly tell the Court *why* [they] believe the trial court's orders are in error, *what* facts were genuinely disputed, or *how* the law supports [their] contentions."[11]

The Texas Rules of Appellate Procedure control the required contents and organization of an appellant's brief, including that it contain clear and concise argument, including appropriate citations to authority and to the record. *See* TEX. R. APP. P. 38.1(h). "This requirement is not

---

[11] Appellees also urge us to find that the TPL Parties waived error because they failed to ensure their response to Appellees' "dispositive" motion for summary judgment was contained in the appellate record. *See Enter. Leasing Co. v. Barrios*, 156 S.W.3d 547, 549–50 (Tex. 2004) (per curiam) (the appellant bears the burden of "bring[ing] forward the record of the summary judgment evidence to provide appellate courts with a basis to review his claim of harmful error"). Although the response was not included in the appellate record at the time Appellees filed their brief, it was included in the third supplemental record recently filed with this Court.

satisfied by merely uttering brief conclusory statements unsupported by legal citations." *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.) (citing *Sweed v. City of El Paso*, 195 S.W.3d 784, 786 (Tex. App.—El Paso 2006, no pet.)). Therefore, the failure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint and leaves us nothing to review. *Id.* (citing *Martinez v. El Paso County*, 218 S.W.3d 841, 844 (Tex. App.—El Paso 2007, pet. struck)); *see also In re A.N.G.*, 631 S.W.3d 471, 476–77 (Tex. App.—El Paso 2021, no pet.) (explaining that issues "may be waived when appellant fails to provide citations, argument, or analysis" and the Court is "not required to perform research nor develop an argument for an appellant who inadequately prepares an appellate brief").

We agree with the Sellers that because the TPL Parties only briefed the issue of error as to dismissal of their breach-of-contract counterclaim and request for specific performance, they waived any argument they may have had regarding the dismissal of their other counterclaims.[12] However, the TPL Parties provided sufficient briefing on issues raised in relation to their claim for breach of contract and request for specific performance. First, their brief sets forth the breach-of-contract claim elements and the requirements for obtaining specific performance. And their brief further provides sufficient argument, with appropriate citation to legal authority and to the record, in support of their argument that the Sellers were the first to commit a material breach of the parties' contract by failing to convey clear title, which excused TPL's performance and resulted in the alleged damages. Accordingly, we turn to the substance of those arguments.

---

[12] As set forth above, these include the TPL Parties' three claims for fraud and their claims for civil conspiracy, breach of fiduciary duty, breach of warranty of title, quiet title, and unjust enrichment, as well as their requests for declaratory and injunctive relief.

## TPL's Counterclaim for Breach of Contract

We first consider the TPL Parties' argument that the record contains more than a scintilla of evidence to support their counterclaim for the Sellers' alleged breach of contract. We conclude that it does not.

### A. Applicable law

To establish a claim for breach of contract, a plaintiff must plead and prove: "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019) (citing *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018)). However, when a contracting party fails to perform a material obligation, the other party's subsequent failure to perform its obligations under the contract is excused. *See Brownhawk, L.P. v. Monterrey Homes, Inc.*, 327 S.W.3d 342, 347 (Tex. App.—El Paso 2010, no pet.) (citing *Mustang Pipeline Co. Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199–200 (Tex. 2004) (per curiam)); *see also Duncan v. Woodlawn Mfg., Ltd.*, 479 S.W.3d 886, 899–900 (Tex. App.—El Paso 2015, no pet.) (recognizing same). Thus, in breach-of-contract disputes where both parties are claiming a breach of contract, a court must determine who breached the contract first and whether the breach was material. *Brownhawk*, 327 S.W.3d at 347 (citing *Driver Pipeline Co., Inc.*, 134 S.W.3d at 199–200 (in cases where both parties are in breach, the proper inquiry is not whether each party materially breached the agreement, but which material breach occurred first)). "This is because the chronology of the material breaches determines which party is released from its obligations, and which party is liable for contract damages." *Id.* (citing *Driver Pipeline Co., Inc.*, 134 S.W.3d at 199–200).

### B. Analysis

In their no-evidence summary judgment motion, the Sellers challenged the last three elements of the TPL parties' breach-of-contract claim, contending TPL failed to perform its obligations under the contract; the Sellers were not in breach of contract; and even if a breach occurred, TPL was not damaged by the breach. In the trial court, as they do on appeal, the TPL Parties acknowledged TPL failed to perform its obligations under the Parcel I Sales Agreement, as TPL did not tender the first installment payment as required. However, they argue the Sellers committed the first material breach of contract, which excused TPL's performance and in turn caused the TPL Parties to suffer millions of dollars in damages.

#### (1) The Sellers did not breach the 2015 Contract

As explained above, the TPL Parties contend the Sellers committed the first material breach of contract when they transferred the Parcel I Deed to TPL in 2017 without having clear title to the Property. However, the only evidence they point to in support of this theory is the 2018 Title Commitment identifying Phase One as having a 43% "record" interest in the Property. As discussed below, however, the fact that Phase One may have still had a "record" interest at that time did not rebut the Sellers' evidence establishing that both equitable and legal title had already passed to Romero and Grab prior to the 2017 conveyance, which in turn gave the Sellers clear title to timely convey to TPL.

First, as the Sellers point out, the undisputed evidence established that Romero and Grab obtained equitable title to Phase One's interest in the Property as early as November 2015, when they entered into sales contracts to purchase Phase One's interest in the Property and when Romero executed and placed in escrow the Phase One Deeds conveying the Property to them subject to their completion of the conditions set forth in the sales contracts. It is generally recognized that "'[e]quitable title' is a right, enforceable in equity, to have the legal title to real estate transferred

to the owner of the right upon the performance of specified conditions." *High Rd. on Dawson v. Benevolent & Protective Order of Elks of the United States of Am., Inc.*, 608 S.W.3d 869, 879 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (citing *City of Houston v. Guthrie*, 332 S.W.3d 578, 588 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)); *see also Alworth v. Ellison*, 27 S.W.2d 639, 640 (Tex. App.—Eastland 1930, writ ref'd) (recognizing that a "person who possesses the right to have the legal title to property transferred to him upon the performance of specified conditions has the equitable title to the property"). Thus, from the date a party signs a contract to purchase real property giving him the right to acquire legal title, the party is vested with equitable title to the property. *See Smith v. Sumeer Homes, Inc.*, No. 05-11-01632-CV, 2013 WL 2467252, at *3 (Tex. App.—Dallas June 6, 2013, pet. denied) (mem. op.); *see also AHF-Arbors at Huntsville I, LLC v. Walker Cnty. Appraisal Dist.*, 410 S.W.3d 831, 837 (Tex. 2012) (recognizing that "[e]quitable ownership [is] the present right to compel legal title").

However, as the Sellers appear to recognize, having equitable title is not the same as having "clear title" to property, and instead, clear title (also referred to as "good title") consists of both equitable and legal title. *See First Am. Title Co. of El Paso v. Prata*, 783 S.W.2d 697, 702 (Tex. App.— El Paso 1989, writ denied); *see also Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied) (holding that "'perfect title' means fee simple title or 'a title that does not disclose a patent defect that may require a lawsuit to defend it . . . title that is good both at law and in equity'") The pivotal question then is whether Romero and Grab established that they also had legal title at the time they conveyed Parcel I to TPL in 2017. We conclude that they did.

As the Sellers point out, Romero submitted an affidavit in support of both motions for summary judgment in which he explained that he and Grab satisfied the conditions of the Phase One sales contracts in November of 2016—several months before the Sellers executed the

19

March 2017 Parcel I Sales Agreement. And in accordance with the memoranda Romero signed as Phase One's president, the warranty deeds Romero had previously placed in escrow became effective to pass legal title to the Property upon the satisfaction of those conditions, even though the deeds remained in escrow and were not immediately delivered to them. *See Boles v. Stonehocker*, 275 S.W.2d 141, 143 (Tex. App.—El Paso 1954, writ ref'd n.r.e.) (holding that note and deed of trust placed in escrow became effective upon fulfillment of the escrow conditions and were not "ineffective for lack of delivery"); *see also Wheatley v. Farley*, 610 S.W.3d 511, 516–17 (Tex. App.—El Paso 2020, pet. denied) (it is sufficient to pass title if the grantor places a deed "within the control of the grantee," despite not physically delivering it to him); *Sykes v. Fischl*, 212 S.W. 217, 219 (Tex. App.—Galveston 1919, writ dism'd) ("a deed placed in escrow to be delivered on compliance with specified conditions becomes effective on the fulfillment of the conditions, though there is no actual delivery"); *Tanner v. Imle*, 253 S.W. 665, 669 (Tex. App.—San Antonio 1923, writ dism'd) (same). As the Texas Supreme Court recently explained, when a deed is held in escrow pending the fulfillment of conditions, it is not immediately effective, but once those conditions are fulfilled it becomes a "deed to all intents and purposes." *Boozer v. Fischer*, No. 22-0050, 2023 WL 4278510, at *4 (Tex. June 30, 2023) (citing 2 William Blackstone, Commentaries *307).

In this same vein, Romero and Grab's failure to immediately record the deeds did not have any impact on their legal title to the Property, as a deed does not have to be recorded to convey title. *See Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 869 (Tex. App.—Dallas 2005, no pet.) ("A deed does not have to be recorded to convey title.") (citing *Thornton v. Rains,* 299 S.W.2d 287, 288 (Tex. 1957); *Burris v. McDougald*, 832 S.W.2d 707, 709 (Tex. App.—Corpus Christi 1992, no writ)); *see also Sumeer Homes, Inc.*, 2013 WL 2467252, at *4 (party's failure to record deed following sale of property did not affect the validity of the transaction). To the

20

contrary, as the Sellers point out, the "only practical effect" of Romero and Grab's delay in recording the Phase One deed was that Phase One continued to "appear" to hold a "record title" in the Property, as reflected in the 2018 Title Commitment. But as the Sellers point out, record title "refers to the *appearance* of title in the public record, but it is distinct from the concepts of legal and equitable title (emphasis added)." *Haynes v. Molina*, No. 01-19-00917-CV, 2021 WL 4155822, at *5 (Tex. App.—Houston [1st Dist.] Sept. 14, 2021, pet. denied) (mem. op.)*; see also Longoria*, 292 S.W.3d at 165 (recognizing that "record title" means "title as it appears in the public records after the deed is properly recorded"). Accordingly, the fact that the 2018 Title Commitment identified Phase One as having a "record" interest in the Property did not have any bearing on whether Romero and Grab had legal title to Phase One's former interest in the Property or their ability to convey clear title to TPL.

### (2) The TPL Parties suffered no damages from any title defects in the deed

Moreover, even if the TPL Parties could establish that the Sellers breached their 2017 Parcel I Sales Agreement with TPL due to their alleged failure to convey clear title, there is nothing in the record to suggest the TPL Parties suffered any damages as the result thereof. Instead, the undisputed evidence showed it was TPL's failure to perform its obligations under the 2017 Parcel I Sales Agreement that caused any damages that TPL, Gonzalez, or both allegedly suffered.

As explained above, the TPL Parties acknowledge TPL failed to make its first installment payment by the April 14, 2018 deadline set forth in the Final Agreement—and the undisputed evidence established that the Parcel I Sales Agreement (the fourth amendment to the 2015 Contract) automatically terminated at that time due to TDL's default, triggering Sierra Title's duty to record the Parcel I Reconveyance Deed.[13] Yet, the TPL Parties continued to negotiate with

---

[13] At times in his brief, the TDL Parties suggest TDL was not in default until July 27, 2018, when the third and final payment was due on the Parcel I Note in accordance with the parties' Final Agreement. However, the Final Agreement

21

Casaporta from April to August of 2018 in an attempt to sell Casaporta the Property, despite no longer having any interest after April 14, 2018, much less legal, or even equitable, title at the time.[14] In fact, the undisputed evidence demonstrated that—although TPL had "record" title to Parcel I at the time of their negotiations—Casaporta's principal terminated the negotiations upon learning TPL had defaulted on the Parcel I Note and therefore itself lacked the necessary legal title to convey any interest in the Property to Casaporta. Accordingly, any profits the TPL Parties may have lost due to Casaporta's termination resulted from TPL's own failure to perform its contractual obligations, not from any breach on the Sellers' part. Similarly, any losses Gonzalez, TPL, or both may have incurred in attempting to purchase or develop the Property also stemmed from TPL's failure to fulfill its contractual obligations, not from any record title issues appearing in the 2018 Title Commitment.

Accordingly, we conclude that the trial court properly granted the Sellers' motion for summary judgment dismissing the TPL Parties' cause of action for breach of contract.

## TPL's Request for Specific Performance

Although not a separate cause of action, we explain below why the TPL Parties' request for specific performance was not supported by the record and was properly dismissed.

### A. Applicable law

"Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract." *See Goldman v. Olmstead*, 414 S.W.3d 346, 361 (Tex. App.—Dallas 2013, pet. denied); *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied). Specific performance compels "a party violating a duty under a valid contract to

clearly stated that the parties' contract would terminate upon the failure to make the first installment payment on April 14, 2018.

[14] The Sellers also introduced evidence that Gonzalez was attempting to negotiate with other potential purchasers and investors for months after he defaulted on the Final Agreement.

comply with its obligations." *See Woody v. J. Black's L.P.*, No. 07-12-00192-CV, 2013 WL 5744359, at \*5 (Tex. App.—Amarillo Oct. 18, 2013, pet. denied) (mem. op.). It is properly used when a court determines that monetary damages would not be adequate to compensate the non-breaching party. *See In re Staley*, 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.); *see also Stafford*, 231 S.W.3d at 535; *Scott Pelley P.C. v. Wynne*, No. 05-15-01560-CV, 2017 WL 3699823, at \*13 (Tex. App.—Dallas Aug. 28, 2017, pet. denied) (mem. op.).

Although specific performance requires the plaintiff to establish the four elements of a breach-of-contract claim, a party seeking specific performance may, in some circumstances, be excused from pleading and proving the second element of a breach of contract claim, i.e., that the plaintiff performed under the contract or tendered performance, as contractually required. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593–94, 601 (Tex. 2008). In the context of specific performance, a party may be excused from performance when the other party has openly repudiated the contract or when the circumstances otherwise suggest it would be "useless" for the party to tender its performance. *Id.* at 594. This "exception to the general rule—that actual tender of performance is a prerequisite to obtaining specific performance—is grounded in the notion that actual pre-suit tender of performance should be excused when it would be a '*useless act,* an *idle ceremony,* or *wholly nugatory.*'" (emphasis in original) *Id.* (*quoting Wilson v. Klein*, 715 S.W.2d 814, 822 (Tex. App.—Austin 1986, writ ref'd n.r.e.)); *see also Chapman v. Olbrich*, 217 S.W.3d 482, 491 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (recognizing that when a party seeks specific performance, the "[t]ender of performance is excused under certain circumstances, such as when a tender would be futile or when the defendants have repudiated the contract"). Nevertheless, "even when a plaintiff's pre-suit tender of performance is excused, he is still obligated to plead and prove his readiness, willingness, and ability to perform at relevant times before specific performance may be awarded." *DiGiuseppe*, 269 S.W.3d at 595 (citing *Ratcliffe v.*

*Mahres*, 122 S.W.2d 718, 721–22 (Tex. App.—El Paso 1938, writ ref'd) (recognizing that "a party seeking the remedy of specific performance . . . must show himself to have been ready, desirous, prompt, and eager" at all relevant times)). In other words, a plaintiff must prove: (1) he tendered performance under a contract or was excused from doing so; and (2) he was ready, willing, and able at all relevant times to tender his performance. *Id.* at 594–95; *see also Smith v. Dass, Inc.*, 283 S.W.3d 537, 545 (Tex. App.—Dallas 2009, no pet.) (recognizing that a plaintiff must establish both requirements to be entitled to specific performance of a contract).

### B. Analysis

We conclude that the TPL Parties did not come forward with any evidence to establish either specific-performance requirement. First, we have already concluded there is no evidence in the record to support a finding that TPL's failure to tender its performance resulted from any breach of the parties' 2017 Parcel I Sales Agreement, as no such breach occurred. In addition, we find no evidence that the Sellers repudiated the contract prior to TPL's default that would have excused its performance. "Repudiation" consists in such words or actions by a contracting party as indicating that he is not going to perform his contract in the future. *Fowler v. Resolution Tr. Corp.*, 855 S.W.2d 31, 36 (Tex. App.—El Paso 1993, no writ) (citing *Group Life and Health Insurance Company v. Turner*, 620 S.W.2d 670, 673 (Tex. Civ. App.—Dallas 1981, no writ)). "It is conduct which shows a fixed intention to abandon, renounce and refuse to perform the contract." *Id.* Here, there is nothing in the record to suggest the Sellers ever expressed any intent to terminate the contract prior to TDL's default. To the contrary, at all relevant times, the Sellers expressed their intent to go forward with the sales contract, giving TPL multiple extensions of time to pay on the Parcel I Note for almost a year before finally terminating the agreement when TPL failed to make the required installment payment on the Parcel I Note pursuant to the Final Agreement.

Second, the TPL Parties failed to present any evidence to establish they were "ready, willing and able" to perform under the contract at all relevant times, as required to be entitled to specific performance. On appeal, the TPL Parties contend they have been ready since at least August of 2018, as reflected in the text Gonzalez sent to Duncan at that time, advising him that TPL had the necessary funds to close the contract and could "close the deal" in ten days. However, as explained above, because TDL had already defaulted on the Parcel I Sales Agreement in April 2018, through no fault of the Sellers, TDL's expression of "readiness" to close almost four months after its material breach does not establish that it was ready, willing, and able to do so at any relevant time prior to the default. To the contrary, the undisputed record demonstrated that despite being given multiple extensions to fulfill its obligation to make even one installment payment on the Parcel I Note, TPL never once tendered a payment while the sales contract was still operative. Nor did TPL ever inform the Sellers it was withholding payment due to any perceived title issues prior to its default; in fact, the TPL Parties acknowledge that they were not aware of the title issues until July 2018—well after the agreement was "kaput"—when they received the 2018 Title Commitment reciting Phase One's record interest in the Property. Accordingly, the record does not contain even a scintilla of evidence to support a finding that TPL was entitled to specific performance.

Because the TPL Parties did not come forward with evidence to support the elements of their claim for breach of contract or their request for specific performance, we conclude that the trial court did not err in granting the Sellers' combined no-evidence and traditional summary judgment motion.

Accordingly, we overrule Appellees' first issue.[15]

## DUNCAN'S REQUEST FOR DAMAGES FOR FRIVOLOUS APPEAL

Finally, we address Appellee Duncan's request for Texas Rule of Appellate Procedure 45 damages from the TPL Parties for filing a frivolous appeal. Rule 45 provides: "If the court of appeals determines that an appeal is frivolous, it may—on motion of any party or on its own initiative, after notice and a reasonable opportunity for response—award each prevailing party just damages." TEX. R. APP. P. 45. An appeal is frivolous when the record, viewed from the perspective of the advocate, "does not provide reasonable grounds for the advocate to believe that the case could be reversed." *Meraz v. Booker*, No. 08-22-00116-CV, 2022 WL 3010077, at *1 (Tex. App.—El Paso July 29, 2022, no pet.) (mem. op.) (citing *Ortiz v. St. Teresa Nursing & Rehabilitation Center, LLC*, 579 S.W.3d 696, 708 (Tex. App.—El Paso 2019, pet. denied)). Whether to grant sanctions for filing a frivolous appeal is within the Court's discretion. *Id.* And we only grant sanctions "in truly egregious circumstances." *McCullough v. Scarbrough, Medlin, & Associates Inc.*, No. 08-12-00205-CV, 2012 WL 3100845, at *1 (Tex. App.—El Paso July 31, 2012, no pet.) (mem. op.).

Appellee Duncan argues an award of damages would be appropriate, not only because he believes the TPL Parties' appeal was frivolous, but because he believes they engaged in "litigation abuse" by bringing their counterclaims in the trial court, which he contends never had any basis in facts or law. Duncan complains that he and the other Sellers spent a significant amount of money and time to bring this matter to a close, complaining of incidents that occurred even after the appeal was filed. And he therefore requests an award of attorney's fees, not just for the expenses the

---

[15] In light of our disposition of Issue One, we need not address the TDL Parties' Issue Two in which they challenge the trial court's order granting the Sellers' "dispositive" summary judgment motion based on the Sellers' affirmative defenses.

Sellers incurred in defending the appeal, but for the expenses they incurred in the five years of litigation. While Duncan spends much time addressing what occurred in the trial court and accusing the TPL Parties and their attorney of wrongdoing, he spends little time addressing whether the arguments the TPL Parties made on appeal were so frivolous that we should consider them to be "egregious" in nature.[16]

Moreover, while we agree with the Sellers that the trial court properly dismissed the TPL Parties' counterclaims as being factually unsupported, we cannot say that the arguments the TPL Parties advanced on appeal were wholly frivolous. It was necessary for us to examine the title issues the TPL Parties raised with respect to Phase One's interest in the Property because of Romero and Grab's admitted delay in addressing those issues. Accordingly, we do not consider this a truly egregious circumstance on appeal, and we decline to impose Rule 45 sanctions against the TPL Parties.

## CONCLUSION

The trial court's judgment is affirmed.

LISA J. SOTO, Justice

September 5, 2023

Before Rodriguez, C.J., Palafox, J., Soto, J.

---

[16] Duncan also contends that the TPL Parties' attorney has "no business holding a law license" and that he should be disciplined by the State Bar for his conduct in pursuing frivolous litigation and "perpetrating a fraud." He further contends that the Texas Real Estate Commission should discipline Gonzalez and that he has "no business holding a real estate license in the State of Texas." We have no authority to discipline either TPL's attorney or Gonzalez in those regards, as appropriate disciplinary boards exist for such complaints.